Good morning. We'll now hear the case of Spiridon Spireas v. Commissioner of Internal Revenue. Mr. Killian. Yes, good morning, Your Honors. I'm Brian Killian on behalf of the appellant, and I'd like three minutes for rebuttal. Granted. Section 1235 extends favorable tax rates to payments that an inventor receives for transferring all substantial rights to his invention. The question in this case is whether Section 1235 applies to the royalties that Dr. Spireas received for two of his successful inventions. Now, Dr. Spireas has invented many different things, and it's important in applying Section 1235 for the court to distinguish between the inventions that are at issue, because confusion about those, I think, is an undercurrent in the tax court's decision. Let me ask you a question. We're very familiar with the facts. Okay. But did Dr. Spireas receive any royalties prior to the time he began getting royalties on the Philodipine invention? Well, this case, Your Honor, concerns only two tax years, the seven and eight tax years. So your question is, did he receive royalties? The Philodipine invention was approved by the FDA in 2004. But under the original agreement, did he receive any royalties before he began getting royalties on Philodipine? No, I believe Philodipine and Papofanone, we don't really discuss Papofanone, but Philodipine and Philodipine, correct, were the only two formulations that were commercial successes under this arrangement, and that's the only two which under Section 4 of the agreement that had gross sales that were the basis for calculating the royalties that he received. And I believe they started before the seven and eight tax years that were issued in this case. But they were due to the Philodipine. But they were due entirely to the Philodipine. That's correct. But doesn't the agreement that talks about this compensation that he received, isn't that the operative instrument for what was transferred? And if the answer to that is yes, then where in the agreement does it say formulations? They transferred rights to formulations as opposed to transferred rights to use of the patent. Sure, Your Honor. I think just to preface, I think there are two critical questions for this court on appeal, one of which is this transfer question. What was transferred? Were the products in the formulations transferred, and then is that what he was being paid for? Where in the agreement is Section 2.1.2, which is page 869 of the record? 2.1.1 is the provision that gives a very limited right to practice the technology so that the parties can develop products, but 2.1.2 explicitly grants all rights exclusively from Spiraeus to Mutual to produce, market, sell, promote, and distribute in the United States products. So not the liquid solid technology, the products. I'm sorry, Judge Hartman. Not the liquid solid technology. The liquid solid technology in the terms of the agreement. He didn't give up all rights to that. No, he withheld rights to that. He still has them. Correct. Yes, he believed that there was a market for nutritional products that he wanted to try to commercialize separately. All right. And when was the transfer of all substantial rights in the products made? So the rights were assigned in the 1998 agreement, Section 2.1.2. Where did you argue in the tax court that the transfer occurred in 1998? Well, I want to be very clear, Your Honor, that the rights were assigned in 2.1.2 so that when those products were created during the course of this relationship, they would automatically transfer. And our argument to the tax court in our post-trial briefs were in accordance with the party stipulation, stipulation number 46, which says, quote, the 1998 agreement governed the relationship and rights of the parties. That has been our consistent position throughout this case. The March 2000 engagement letter, which the tax court has tried to, I think, characterize our position as characterizing that simple letter as the operative. By itself, the instrument of transfer is an oversimplification of our position. Isn't that what your expert testified to in the tax court? Judge Gould was, excuse me, not Judge Gould. Mr. Gould was asked a question outside the scope of his expertise on that question. We proffered Gould to testify on two topics, what are substantial rights for this product and whether the product was patentable. Outside the scope of his expertise, he was asked a question on that, and he mischaracterized our position. Your Honor would notice in our post-trial briefs that below, we did not rely at all on that testimony from Gould because it was not our position. Mr. Gould misunderstood the argument that we made, and I think the tax court incorrectly attributed it. Even if you're an expert, you know, as trial lawyers like to say, went south on you. But on a topic he wasn't even an expert on. It doesn't matter. He offered testimony, as I recall, correct me if I'm misremembering it, that said, well, the 98 agreement, that was an R&D agreement. The real license agreement occurred in the March 2000 letter. Wasn't that the essence or part of his testimony? That was his answer to the court's question, yes. And you're saying that because that's, quote, outside his expertise, that the tax court was supposed to disregard it or could not take cognizance of it? Well, the tax court, I wouldn't say it couldn't take cognizance of it, but it's not what Gould was an expert on. Experts are proffered for a particular area of expertise, which in this case was about science. What was the, whether this product was patentable, and then what are the substantial rights that appertain to the Floripin formulation? All right, well, if you didn't waive the argument, if you're not shifting gears and making a new argument now, let's look at the merits. How could it be that in 1998 your client transferred the formulations to Floripin and Propafanil, and they weren't even created until two years later? Because it's been well accepted, I think, for over a century in intellectual property law that inventors can assign rights to future inventions so that when the inventor creates that invention in the future, the rights automatically transfer to the designee. We talk in our briefs about the cases of future improvements, inventions that use and build upon earlier inventions, but there's more than just that. Even if this agreement were to cover a future formulation, as you're attempting to suggest now. If Your Honor has any doubt about that, I'll do my best to. Let me just finish my question, okay? Section 7.2 and 7.3, the only real reference to formulations, talk about the fact that they continue to belong to Dr. Sparius, Dr. Poulton, and their company. And 7.4 talks about any patents resulting from a product that's developed using this technology is the property of those same three, the two individuals and the entity. So assuming the formulation is somehow contemplated, doesn't this make clear who it belongs to and who has the interest in it? And therefore, the terms of this agreement do not permit a transfer in the way that you suggest to avoid the taxation. I completely disagree, Your Honor, and I'll do my best to explain. What Section 7.2 does is it rebuts the presumption in patent law that a party like Mutual who participates in the production of a new invention has an automatic implied license to that, what patent law calls the shop right, whether it's a common law right or an equitable right. What this says in the operative key language in 7.2, which I direct the Court to, is a representation warranty. Unlike Section 2 of the agreement, which is actually an assignment of rights, the representation warranty in 7.2 says that when one of these formulations comes along, it's going to be, it's going to start with Spiraeus, but then will be, quote, subject to the rights of Mutual and United under this agreement. Which is to market and sell. Which is the, exactly, and that is all substantial rights. That is my point, that what 7.2 provides the foundation for Section 2.1.2, because the Court remembers that in 1998 there were no formulations. In 1998, all that existed was the patent, and that the parties were going to then do their best to create formulations. In fact, Section 2.5 of the agreement says that Dr. Spiraeus will do his best, quote, to give rights to three products to Mutual in the first year of the agreement. Because they were going to... If you look at the original agreement, it would seem that it was not expected as formulas were developed that they would reach the stage where they were patentable themselves. That you would not need a separate agreement like you have in the March 20. I don't follow your Honor's question. I think the parties intended that products would be remaining as trade secrets, because they thought that they would be able to extend the monopoly by keeping these things a secret. But the fact that to formulate Philodipine, you had to do innovations that were, in fact, patentable. Correct. That it was not foreseen that all the... The products would be like that? All the products would be like that. So I think I disagree with that, Your Honor, because if I can give the court an analogy to help it understand, I think, the difference between the liquid-solid technique on the one hand and the formulations on the other. The liquid-solid technique is a lot like baking, a way of cooking and applying heat to food. The Philodipine formulation is like a recipe that uses baking, but that, as the court will know, there's more to a recipe than just the baking. But Philodipine was very complicated. Philodipine as a compound, as a chemical compound, had very difficult traits that Dr. Sprayes had to try to solve, and that was his solutions to the heat and light sensitivity of the Philodipine compound are the additional patentable know-how that made the Philodipine formulation itself a stand-alone invention. So it uses the liquid-solid technique in a way that a recipe for a cake... But it was not foreseen that every product that they formulated would be so complicated. I don't know if that's true, Your Honor. I don't think the text of the agreement one way or another dictates that they thought there would be rote application, but it is, I think, stated by the expert and by Dr. Sprayes below that there is no rote application of the liquid-solid technique to a particular compound. There's always some tweaking and additional work that needs to be done in order to make something a potentially patentable formulation. If Your Honor still have questions about the transfer, I absolutely don't want to let that go, but I also want to explain to the court why Mutual here was paying for the rights to the products and not paying for the rights to the technology. I'd like to stay on the transfer issue, if we could. Because you hearkened us back to the grant of exclusive rights in 2.1.1 and 1.2, et cetera. Correct. And it talks about what's transferred, and it's talking about the technology. Sure. 2.1.1 does that, absolutely. 2.1.1 gives the exclusive rights to utilize technology and a very limited right. We can see that Dr. Sprayes withheld much rights to the technology, but the 2.1.2 provision, the next one, is the one that is much broader. Nothing is withheld as to products. Products containing the technology that they're permitted to use. Correct. And I think if Your Honor, if you think about it this way, what was given was an unlimited right to the products. But let's talk about that. The product had to be agreed upon by all the participants, so he retained a veto right. Correct. He kept his right, and when I say he, I'm talking about the taxpayer, kept his right to be able to use that technology in other fields. Correct. Which we know is, if you do that, that is a manifestation that the tax regulations are not retaining a substantial right. As to the technology. But this contract, that's what it deals with. It's the right to use the technology and create products using that technology. I think the tax, how does the tax court run when they said you want, it sounds like you want to make a different agreement about what you've given up with respect to formulations. Well, Your Honor, the limited rights that you described, the conditions that you described, are all conditions on the rights to the technology. That mutual could not go off and use the technology any way it wanted. It needed to work with sprayers to figure out which compounds they would investigate. And he withheld rights, as I noted, to the nutraceutical uses of the technology. Conceded. The question is whether when you have something that is also conceded and found by the tax court to be independently patentable, the formulation, what did Dr. Sprayers do with those rights? And it is clear under 2.1.2 that that separately patentable independent invention was exclusively assigned under 2.1.2. Even though it didn't exist. That's really, your case hinges upon the ability to give away something that doesn't exist. to assign the rights before the patent is invented. And what's the authority for that? So we cited to the court several cases that go back to the 1800s where there are assignments of patent rights that when a second invention builds upon an earlier invention, uses an earlier invention, it has been well accepted for over 100 years that parties would assign those rights. And then if I also may, Your Honor, because I see you... Well, I'm just not sure that this fits that rubric, but I'll give you a chance to explain why it does. A more traditional case. This isn't a single wing aircraft that turns into a double wing aircraft. There's a pretty clear distinction, at least in my mind, perhaps you'll tell me why it's incorrect, between the technology on the one hand and the products on the other hand. The other example that I'd give, Your Honor, is the much more run-of-the-mill example of an employee. Employees, as the Supreme Court said in the Stanford v. Roche case, which we cite in the briefs, human beings are inventors. Companies are not inventors. So when an employee invents something under the federal patent law, that human being has all the patent rights that pertain to that invention. But employees enter into agreements with their employers all the time before any invention comes into being that assigns the rights to any inventions that the employee makes to his or her employer. Now, Dr. Sprace was not an employee in the sort of common law sense. The agreement is very clear that he was acting as an independent consultant. But the fact that the patent law has long allowed employees to pre-assign their rights... But that's a function of principal and agent law. No, it's a function of contract, because if the employee didn't enter into that agreement, there would be no assignment of rights. All that would happen would be a limited license, the shop right to the employer to use it, but it wouldn't be exclusive, and the employee would be able to make exclusive licenses with others. I guess what's puzzling to me is why was it so difficult in 2000 or 2001 for the taxpayer to enter into an agreement with Mutual that made it clear that it was giving up substantially all its rights to the philodependent professional? My answer to that, Your Honor, is they already entered into that agreement in 1998. They didn't know, I think, in 1998, you know, when a particular formulation would be invented. But what they decided at the beginning, before the endeavor had matured very far, is they set upon the terms of their agreement, that when one of these formulations was created, there would be royalties of 20 percent paid to Sprace. And so they didn't sort of renegotiate that several years later when they realized that the philodendent formulation was going to be a multibillion-dollar success. I mean, at that point, I think the negotiation dynamics would be very different. How? How? They would, I think, understand at that point the potential market and have much more, I think, of a combative, potentially, negotiation. But at the beginning, it was not. I'm not sure I understand why that would impair Mutual's willingness to explicitly acknowledge Sprace's entitlement to capital gains treatment rather than ordinary income treatment. It just doesn't seem, I don't understand why that's a complicated hurdle for the parties to have surpassed in 2000 or 2001. Your Honor, I think we're getting into a little speculative realm here about what the parties may or may not have done at that point. But I think Sprace took it to a different pharmaceutical. He could have gone to a pharmaceutical company. If your assumption is, excuse me, the court's assumption, is that there was no pre-assignment of rights, no exclusivity in the original 1998 agreement, nothing would have stopped Dr. Sprace from shopping this to other pharmaceutical companies later on. But instead, in 1998, the parties made a commitment to each other. They said, we're going to do our best in several years to identify particular chemical compounds that we wish to formulate with the liquid-solid technique. And when one of those, if any, is a success, then we will commit to pay 20% of the gross sales of that formulation. And the reason the parties did that was because the formulations were, as Dr. Sprace testified below without any dispute from the other side, is where all the money was. The product itself, excuse me, the technology, was not assigned value. And we described to the court in our briefs the sort of the Brulotte Rule that under IP law encourages parties to enter into these agreements in advance and assign royalties to trade secrets rather than to patents. But the court here, I guess, is much more focused on the transfer question than on the what were the payments for question. I haven't gotten to discuss that with Your Honors yet. Why don't you go ahead. Okay. I'll try to be brief because I see that I'm over my time. I think we've argued that the agreement shows that all of the payments that each were made to Dr. Sprace were for just the fullerton formulation. But they weren't just made to him. And I think that's what the tax court focused on. They were made payable to both him and the entity. And that seemed to be an important distinction for the tax court. It was for the tax court. And if Your Honor may, I'll answer that in just a moment because I want to focus the court on Section 2.4 of the agreement. 2.4 says that Mutual and United shall have the exclusive right to produce and sell each product developed here under for the life of the product. And this is the important part. As long as Mutual and United pay to Hygrosol, the compensation set forth in Section 4. So what 2.4 says is that the failure to pay forfeits Mutual's rights to the products. It doesn't forfeit its rights to the technology. It doesn't forfeit its rights to the patent. It doesn't forfeit its rights to ask Dr. Sprace to engage in the development of other formulations. The only thing that the payment of royalties is contingent on in Section 2.4 is the continued use of the products. So in an ordinary sense, what were these payments for? They were for the products. Now, Judge Schwartz, you noted that the tax court observed that the payments after Mutual made them were split 50-50. The Section 4 of the agreement requires Mutual to make those payments to Hygrosol, a pass-through company. There's no evidence in the record that Mutual knew that Hygrosol was owned 50-50 between these two men. The vision could have changed dramatically over time. I think that our point is that what Dr. Sprace and Mr. Bolton decided to do with the money after it was paid by Mutual does not undermine what Mutual was paying for under the agreement. And Section 2.4 shows is that what Mutual was paying for was for the continued use and exclusivity of rights to the Philodepin formulation. So if I distill our case very succinctly, it's 2.1.2, which the tax court simply disregarded because it believed that as a matter of IP law, one could not pre-assign rights to an invention. And I think we've shown in a variety of contexts why inventors can and do often pre-assign their rights to future inventions. So that error of law that the tax court made, I think, doesn't suggest that we need to undermine 2.1.2. Did it say you can't assign rights to future inventions or that this is not such an invention that would qualify? No, I believe the tax court's opinion was something along the lines of it was not possible in 1998 to transfer rights to something that did not exist. And as we showed, I think that while the product didn't exist, those exclusive rights to that future product were transferred in the way that they are in a variety of contexts that I've described to the court this morning. So really your case comes down to a legal determination of whether one can anticipatorily assign rights to a not yet invented product. An invention. Yes. Wait a minute. I'm with Judge Hardiman on this. And I saw your language between the, maybe not your personal language, but language in the briefing to the tax court and mine, which is a little different. I would like to know, sorry to interrupt you, Judge Hardiman, what is the difference in your mind between a product, the technology, a formulation? Absolutely. So the technology is the liquid-solid technique. It is what is the subject of the four patents that were issued to Dr. Shabraus. So is patent and technology equal? They mean the same thing? Yes. Yes, I believe that's almost correct because there was only one patent in 1998. The three others came later on. It's still the same liquid-solid technique. All four of those patents are related. So even though the last patent was issued in 2002, it expired in 2016 along with the original patents. They all expired at the same time. Judge Hardiman's question now. What's the difference between the tech, the products, and the formulations? Formulations are the recipes, if you will, to go back to sort of the baking analogy, that Dr. Shabraus works on in the lab, but not every formulation becomes a product because what makes a product under the agreement is just a product. We didn't transfer formulations. We know that. Oh, we did. That's how you transfer products. You're right. The exclusive rights under 2.1.2 were for products. Products are formulations that were approved by the FDA, whether through the new drug application process or for the abbreviated new drug application process. That's the definition of a product. So there were many more formulations than actually became products. And Spiridus did not patent the felodipine, made it a trade secret, and said so that the patent wouldn't expire? The parties made it a trade secret, I think, as we've said in the brief. Because trade secrets don't expire, and patents do expire, and you can't pay royalties on an expired patent. Well, I think I'd say it slightly differently, Your Honor, is that a trade secret comes with risks. You get a potentially longer protection. But you can't get royalties on an expired patent. Correct. And you can get royalties on a trade secret. You can, yes. You can get royalties on a trade secret. But the risk that it comes with is if someone else discovers your secret, you're out. You can't stop it. That's the tradeoff that they made. Rather than 20 years of guaranteed monopoly through patenting, they decided to take the risk that no one else in the world would be as, I guess, inventive as Dr. Spiridus. Well, you also get the benefit of keeping it confidential. Correct. Yeah. And that was seen, I think, somewhere in the submissions I read somebody thought that was important. Yes, yes. Well, in order to keep it a trade secret, the parties had to agree to keep it confidential. My point is that it's a patent put out there in the public domain, lots of data. Correct. Keeping this a trade secret allowed for what Judge Roth was alluding to, a longer period for a money flow. Correct. Plus not disclosing to others what the secret and the sauce was to make it work. That's right, Your Honor. And I guess the other point I make related to this is the parties did not know in 1998 when, in the many years that they've been working together, they would actually come up with a product. The first and only successful ones were in 2000, but it might have been in 2015, one year before the patent was about to expire. They were setting out on a journey to figure out which chemical compounds would be successful when applied to the, when half-a-liquosol technique applied to them. And if the underlying patents on the technique have expired. They did last year. And it is held that by, we should hold agreeing with the IRS that the patents have expired and there's no need to pay any more royalties. Is that correct? I think that's the risk, Your Honor. Yeah, the royalty payments would be fundamentally different. Royalty payments for the patent would have to stop in 2016 under the Burlant rule. That rule has been in place for 50 plus years at this point. So, I mean, the parties sensibly and economically wrote their agreement so that they could tie the payments to their trade secrets instead. That's right. I'm sorry, I've gone way over Your Honor's time. We'll hear Your Honor follow. Thank you, Mr. King. Thank you. Mr. Carpenter? Could you start with the waiver issue? As I understand Mr. Killian's argument, he says that it's not the case that in the tax court they argued that the transfer occurred in 2000, and here they argue that it occurred in 1998 because in the tax court their post-trial submission argued that the transfer occurred in 1998. That's what I understand his argument to be on waiver. Is that your understanding? And if so, what's your response? Yes, I think, one, I understand his argument just slightly differently. I believe he was also referred to a stipulation where the parties had agreed that the 1998 agreement sort of governed their relationship overall. But otherwise, I believe your assessment is correct as to what their position is. Our position disagrees. As you pointed out, their expert testified, and this is their licensing expert, not their expert on what was patentable, but they're essentially an expert to explain what the agreement meant. And that expert testified at length that the 1998 agreement was really just a research and development agreement and that the agreement that supposedly transferred all substantial rights to the Philippine formulation was that 2000 letter. And it wasn't just in response to a question from the court. It's lengthy. It's on pages 246 and then 256 through 264 of the transcript. You can see that that's their expert's theory of the case. Then in their post-trial briefing, they- Just because that's their expert's theory of the case, they disagree with that, I don't think that means that they forfeited the argument, right? Well, no, not that alone. There has to be more. Right. They adopted that position in their post-trial briefing, which is really the party's first opportunity to argue. They adopted what position? The expert's position that the 2000 letter was effectively a separate licensing agreement that licensed the formulation. Now, they expanded on that because essentially they agreed with their expert that the formulation could not have been transferred in 1998 because it didn't exist. When the tax court said that, he was agreeing with their position. And so they pointed to, like their expert, the 2000 letter. And then they also made a couple of course of performance type arguments to say that even though the 1998 agreement didn't transfer rights to the formulation, the parties treated the formulation as if it was transferred under the 1998 agreement. And so that was their approach. That was their theory as to how a transfer of rights to the Floridabene formulation occurred. Now, on appeal, they're not arguing any of that, and they're arguing instead that the 1998 agreement by itself transferred prospectively future rights that Spryce would later require to the formulation. If we rule against you on your waiver slash forfeiture argument, why are they incorrect that they could not have assigned a product that was yet to be developed? Well, they're not. As a matter of law, they're not incorrect about that. It is possible to transfer rights to a future invention that hasn't been invented yet. But this agreement didn't do that. Why not? Well, the parties knew well how to transfer future rights or rights to future inventions because they did exactly that. They did it in Section 7.4 of the agreement, which is on page 75 of the appendix. And in Section 7.4, they expressly transferred rights to future patents, and they specified patents that may arise during the process of development. And because of that provision, there's no dispute now that the definition of technology in the agreement encompasses not just that original patent that was about to be issued in 1998, but it also covered the other three liquid solid patents that were issued over subsequent years. And it keeps it, say, with 7.4, when you say they transferred, doesn't the language of that say the new patent will be the property of Iversol and the two scientists? That's who's going to get it? The new patent shall be their property? So it's not really a transfer. It's a staking out of who owns what, correct? Oh, it does say that it will be their property, but then it goes on to say that mutually united will have the right to use the patent, as if described in the definition of patent, which patent equals technology. It's the technology. So once again, it's an ability to use the patent, but the ownership of the patent itself remained at all times with taxpayers. That's exactly right, and I'm sorry. Including ones in the future. Right. We're covering that. Yes. So there's a bundle of rights that come with a patent. One of those rights is the right to use the patent to make things for whatever purpose, and so the 1998 agreement did transfer some of those rights to use the technology. For limited purposes, right? For limited purposes, exactly. Based upon the products they unanimously agreed to have in the format area, so long as the taxpayer wasn't already negotiating with others to do the same thing. That's right. That's right. And so Section 7.4 says that if future patents come about through this process, then you can also use those future patents for that same limited purpose. So what 7.4 does, why it's relevant here, is that it shows that they knew clearly how to transfer a future invention, or transfer rights to a future invention, because they did it. They transferred limited rights in Section 7.4. But if you look through the agreement, there's nowhere where they transferred, where they did something similar for future formulations or products. The preamble sets out what the… So you're saying the license that Mutual was given to produce, develop, market, sell products was not a transfer? It was just an ability to do those things that those verbs characterized, but it wasn't a transfer? It was a transfer of rights to use the technology to do those things, because products are defined as products containing the technology. So why did Mutual need to use the technology when Dr. Spiraeus had the know-how to use it? He was the one using the technology, wasn't he, in the lab? Yeah, he was the one who was actually doing the physical use. So why does Mutual… Mutual is just a pharma company. They're the ones that have the factory, that can produce it, market it, distribute it, all that, right? That's right. That's right. But Mutual can't do that because the formulation for flotapine and anything else. Because those formulations relied on and were created using the technology, Mutual couldn't then use those formulations to make the tablets to sell to the public without also using the technology. So Mutual needed a license to use the technology because it was necessarily using the technology. To manufacture the drugs. Exactly. Exactly. So as it turned out, in this instance with flotapine, through that process of development,  and theoretically, Dr. Spiraeus could have transferred rights. I'm talking about the formulation. He could have transferred rights to that formulation. That gets back to the question I asked Mr. Killian. Could they have just done a simple agreement in 2001 saying, We have these products, they're marketable, they're useful, and we hereby agree that Dr. Spiraeus transfers all interest in those products to Mutual. Had that been done by agreement in 2001, then he would be entitled to the capital gains favorable rate, would he not? Yes, they could have done that. Assuming that the transfer was of all substantial rights and so forth, then yes, he would be entitled to capital gains treatment for whatever compensation that agreement provided. So is this just a gotcha case where there might have been good lawyering on the technology and patent side, but not on the tax side? Is this a gotcha case? Because it seems that the parties contemplated in 1998 that if he developed some marketable products, the deal was Mutual manufactured and marketed and sold the products, then he got 20%. Right. It seems obvious to me that when the parties all unanimously agreed that they would move forward with a product, there were some 100 products at one point identified, then it was 20, now we're talking about 2 or 3. It seems clear that in 1998 the parties contemplated that Dr. Spiraeus would not then be able to take one of those products that they had all agreed upon and go shop it to Merck or Pfizer, right? Sure. They had a deal with Mutual, and they had to go forward with Mutual. Right. He couldn't have shopped it to Merck or anybody else because the formulation that he created used the technology, and he did give exclusive rights to use the technology for Philodipine to Mutual. So he can't then take the formulation which uses the technology and give it, transfer it to somebody else, because then they would be infringing Mutual's rights to use the technology for the formulation. So why don't all those undisputed facts add up to an intent of the parties looking at the transaction holistically to transfer all rights in Philodipine and Propafenone to Mutual? Sure. So a few reasons. As we talked about in our brief, there are issues. I think what you're suggesting would be an implied transfer. There's no express transfer in the agreement that says, you know, we're just – Well, there's an express transfer of the product, isn't there? No, no, there isn't. You're saying that's the problem. There's an express transfer of the technology. There's an express transfer of the technology. The case, from your perspective, comes down to whether they transferred the – and I guess the tax court was that, look, substantially all of what? The what is the technology, not the product? That's right. That's right. Our case comes down to two points, and that's the first one. So then what is Section 2.1.2? 2.1.2 gives Mutual the right to produce and sell products that contain the technology, and it says that in 2.1.2, products containing the technology. Exclusive right. Yes, the exclusive right to produce and sell products containing the technology. So – but that exclusive right is not all substantial rights because products is the narrow group of products that they selected. But I think to get to the point, I think you're getting at – But a product being a patentable, potentially patentable item, and they have exclusive right to sell it, what further right can be? There has been nothing withheld then by Spireas. Well, that would be, I suppose, that would be a question for the tax court on remand because that is a factual question as to whether there are other rights that may or may not have been withheld. But what was being transferred there, however, is not rights to products because products could have involved other intellectual properties. In fact, in Philodipine, it involved a formulation. It's possible there could have been other intellectual properties that needed to be licensed from other people. But there was never any royalty paid before Philodipine began earning money, so there was never any other product that fit within the parameters of Paragraph 2.1.2. Yes, at least not that we know of from the couple of years that are issued in the record. That's right. And that goes to our second point, which is that even if you accept that there was a transfer, that this agreement transferred rights to the Philodipine formulation, even if you accept that the formulation is the same thing as the product, which they conceded that it isn't, they would have to show that all of the royalties were paid solely for that product. Now, the royalties were based, the measure of the royalties was based on sales of the product. But that's how almost every license agreement works. And until the product was being sold, there were no royalties paid. That's correct. That's correct. Dr. Sprayus was paid separately under Section 5 of the agreement for his development. Yes, but he wasn't paid any royalties until products. But, again, that's how most patent licenses work, especially when you're talking about a patent like the liquid-solid patents that are method or process patents. They're not a patent for a tangible item. They're a patent for a process of how to make something, for example. So you can't base royalties on making the liquid-solid technology because that's not something that can be made. You base the royalties based on what you make using the liquid-solid technology. And so those royalties were to reflect the use of the technology and finally became manifest with this particular product? Exactly. And they were being paid not just for the use of the technology in that product, but for the other uses of the technology. As the tax court found, there was over a dozen products that the parties identified that they were going to try to make sellable versions of using the technology. But were they ever the source of royalties? Because no royalties were paid until Philodipine started earning money, and the royalties were based upon the gross profits from Philodipine and the other insignificant little item. Right. Those other products didn't... So what's all this talk about six or seven other products? That's because what Mutual was paying for when it paid royalties was not just for the right to use the technology in Philodipine, in the Philodipine product, but also the right to use the technology in its efforts to develop all of those other products because it needed those rights in order to do that. But when it was trying before Philodipine to develop other products, no royalties were paid. That's correct. And the royalties were based exclusively on the gross profits from Philodipine. Yes, the amount of the royalties was based exclusively on gross profits from sales of Philodipine. But again, that's how license agreements always work. The person licensing the technology or the process, they don't know in advance how that's going to play out and it's going to result in a successful product. The licensee doesn't necessarily know that either. So the licensor can say, well, pay me a flat amount up front and then you can use it for whatever you want. Or you can pay me royalties and we'll sort of share the risk that this will work out or won't work out and make money. So pay me in royalties and I'll get a percentage of whatever successful use the licensee is able to make of the technology. And so the parties in this case chose to do royalties. But the royalties were based on, they were measured on only the successful products. But what they were paying for was the right to use the technology for all products, whether successful or unsuccessful, because without that right, Mutual could not have developed any of the products. Then why did they have to pay royalties before the development of Philodipine? Well, that's how the agreement, that was the agreement they entered into. Sprays could have demanded an up front payment in addition to maybe a smaller percentage. But that's just not how they did it. And nothing in the agreement about such a payment. No, no, there isn't. But I guess my point is just that that doesn't show whether or not the royalties were being paid solely for Philodipine. It's just that's how they entered into the license agreement. Many license agreements work like that. The fact that, well, to give you an example, in the Bullock case that they raised for the first time in their reply brief, but in that Bullock case, the patented issue was a machine that was used to harvest crops, particularly hops, like hops that are made in beer or used in beer. So it was a machine that could harvest hops. And the patent holder licensed that machine to farmers to use in harvesting their crops in exchange for royalties that were based on a percentage of the crops harvested. That doesn't mean that the patent holder to the machine had any rights to the crops, had any rights to the harvesting of the crops. That was just the way that the parties agreed that they would measure how much the patent holder should be paid for letting them use the machine. It's the same thing here. The way that the parties decided how much Dr. Spirez and Dr. Bolden should be paid for letting Mutual use their technology was based on sales of products. And they went into that knowing that some products may not sell anything. Some products may not even be successful enough to put on the market. But that was just what they chose, how they were going to measure it. Thank you. Thank you, Mr. Carver. We'll hear Mr. Killian on rebuttal. Yes, thank you, Your Honors. The reason we raised Bullock the first time in our reply brief was that the government's opposition brief in this court was the first time it ever claimed that our royalty was secretly being a payment for the patents and the technology. So we had to explain to the government why, as a matter of intellectual property law, that would be illegal. The government has talked today about what the payments were for. He talks all about Section 4 and what the measure of the royalties were. He did not say anything today about Section 2.4. That's the provision I told the court about. It's in our briefs. It says if you don't pay, you forfeit your rights to the products. What is something for? What is a payment for in a sort of metaphysical sense? It's for what you lose if you stop paying. And the only thing the agreement says that Mutual loses if it stops paying the royalty is the exclusive rights to products that were given to Mutual under Section 2.1.2. The government conceded just a few moments ago that parties may reassign rights. It's not illegal. In fact, they do it all the time. The only question is, is that what the parties have done here? Section 2.1.2 does exactly that. The government's theory of Section 2.1.2 as essentially an assignment of rights to the technology renders 2.1.1 superfluous. Technology was assigned in 2.1.1. That was a very limited right to the technology, as Judge Schwartz noted with me in the opening. But Section 2.1.2 gives rights not to the technology. It gives rights to the products that contain the technology. And if there was no transfer of the rights, then one has to question, how does Mutual have all the rights to the products today? I mean, it's clear that Dr. Sprays, as a matter of intellectual property law, had all the rights to his invention. And it's clear today that Mutual is the only entity in the United States that's allowed to sell the Floridacon formulation on the market. That didn't happen by accident or by magic. It happened because there was a transfer to 2.1.2. On the waiver point, Your Honors, I will be very brief. Page 27 of the Appellant's Supplemental Appendix is one of our post-trial briefs where we talk about the March 2000 engagement letter. That March 2000 engagement letter notes that it was done pursuant to, that's the language in the letter, the letter itself says this letter is pursuant to the 1998 agreement. And on that page 27 of our Supplemental Appendix, we explain, therefore, that the rights were transferred under the 1998 agreement. That has been our consistent position. That's a pretty cryptic way to say it, isn't it? In what sense, Your Honor? You're saying it a lot more clearly now on appeal. I mean, your appellate brief, I thought, you know, made a clear argument that, look, and you made a very clear argument here in front of us that, look, in 1998, if you look at the terms of this document, we transferred these rights. I agree. I mean, I don't imagine you tried the case in the tax court, so I don't mean to beat you up about it, but, I mean, is there anything more than that little snippet you just gave us from a post-trial brief as to where this was preserved below? Our applied brief has more citations than that, Your Honor. That was the one I thought that was sort of the clearest for the court. I'm just not as familiar with the briefing in the tax court as I am here. Tell us a little bit more expansively. Where in the tax court did you wave the flag and say, my client transferred rights in 1998? Our consistent position has been that the 1998 agreement and the 2000 agreement aren't alternatives. It's not a dichotomous choice that we either transfer under one or the other. It's that the 1998 agreement set the rights and responsibilities as the parties stipulated, and I told the court about that stipulation in my opening. And pursuant to that agreement, it required mutual dissent engagement letters, periodically, along with a $10,000 check, identifying individual compounds. That's what the March 2000 engagement letter was. And the letter on its face says, this is pursuant to the agreement we entered into in 1998. And so forth from there, Dr. Shkreis set about to find a formulation for felodipine. He successfully did so. And pursuant to the 1998 agreement, Section 2.1.2, when that formulation was approved as a product by the FDA, it became the exclusive right of mutual to sell. Is it your position the 2000 agreement transferred nothing new? The 2000 agreement was not an instrument of transfer. It was an engagement letter. We call it such in our brief. It identified a product, and it made a payment, and the parties followed the rights and responsibilities. Did you argue to the tax court it was an instrument of transfer? That was not our position in the tax court. You did not argue that to the tax court. Correct. But your expert opined that, but you didn't argue that. That's correct. That's correct. Your Honors, we believe that the tax court focused on the wrong invention, the liquid-solid technique, and not the formulation, misunderstood basic principles of intellectual property law that the government now concedes animate these agreements, and misread the parties' agreements because of its improper focus and because it misunderstood the IP law. And for those reasons, the judgment should be reversed. Thank you. All right. The court will take the matter under advisement, and we thank counsel for the outstanding argument today. It was a pleasure. Thank you.